UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

KIMBERLY A. JOHNSON                                           PLAINTIFF

v.                                          CIVIL ACTION NO. 3:13-CV-65-S

CAROLYN W. COLVIN, ACTING COMMISSIONER
OF SOCIAL SECURITY                                           DEFENDANT

**FINDINGS OF FACT**
**CONCLUSIONS OF LAW**
**AND RECOMMENDATION**

Plaintiff Kimberly A. Johnson has filed a complaint pursuant to 42 U.S.C. §405(g) to

obtain judicial review of a final decision of the Commissioner of Social Security that denied her

applications for disability insurance benefits (DIB) and supplemental security income (SSI).

Johnson applied for DIB and SSI on November 18, 2009, alleging that she was disabled as of

March 17, 2009, due to degenerative disk disease of the lumbar and cervical spine (Tr. 37). The

Commissioner denied Johnson's claims on initial consideration (Tr. 131, 142-45) and on

reconsideration (Tr. 147-149). Johnson requested a hearing before an Administrative Law Judge

(ALJ) (Tr. 141).

ALJ Roland D. Mather conducted a hearing in Louisville, Kentucky, on June 10, 2011

(Tr. 47-83). Johnson attended with her attorney, Gerard Breslin (Tr. 47). Johnson and

vocational expert (VE) Robert Piper testified at the hearing (Tr. 51-76, 77-82). Following the

conclusion of the hearing, ALJ Mather entered a hearing decision on September 2, 2011, that

found Johnson is not disabled for the purposes of the Social Security Act (Tr. 35-43).

In his adverse decision, ALJ Mather made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act
        through December 31, 2014.

2.      The claimant has not engaged in substantial gainful activity since March 17, 2009, the alleged onset date (20 C.F.R. 404.1571, *et seq.* and 416.971, *et seq.*).

3.      The claimant has the following severe impairments: history of degenerative disk disease of her lumbar and cervical spine (20 C.F.R. 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except that she is limited to lifting/carrying no more than 10 lbs.  She must avoid repetitive bending (from the waist), lifting, or stooping positions.

6.      Supported by the testimony of the vocational expert, the claimant is capable of performing past relevant work as a check processor.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.  (20 C.F.R. 404.1565 and 416.965).

7.      The claimant has not been under a disability, as defined in the Social Security Act, from March 17, 2009, through the date of this decision (20 C.F.R. 404.1520(f) and 416.920(f)).

Johnson sought review of the hearing decision by the Appeals Council (Tr. 9-18).  The Appeals Council denied her request for review, finding no reason under the Rules to review ALJ Mather's decision (Tr. 1-8).  The present lawsuit followed.

**The Five-Step Sequential Evaluation Process.**

Disability is defined by law as being the inability to do substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months.  See, 20 CFR §§ 404.1505, 416.905(a).  To determine whether a claimant for DIB or SSI benefits satisfies such definition, a 5-step evaluation process has been developed.  20

CFR §§ 404.1520, 916.920(a). At step 1, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the Commissioner will find the claimant to be not disabled. See, 20 CFR §§ 404.1520(a)(4)(i), 416.920(a)(4)(ii), 416.971. *See, Dinkel v. Secretary*, 910 F2d, 315, 318 (6th Cir. 1990).

If the claimant is not working, then the Commissioner next must determine at step 2 of the evaluation process whether the claimant has a severe impairment or combination of severe impairments that significantly limit his or her ability to perform basic work activities. See 20 CFR §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the impairments of the claimant are determined by the Commissioner to be non-severe, in other words, so slight that they could not result in a finding of disability irrespective of a claimant's vocational factors, then the claimant will be determined to be not disabled at step 2. *See, Higgs v. Bowen*, 880 F.2d 960, 962 (6th Cir. 1988); *Mowery v. Heckler*, 771 F.2d 966, 971-72 (6th Cir. 1985).

If the claimant has a severe impairment or impairments, then the Commissioner at step 3 of the process will determine whether such impairments are sufficiently serious to satisfy the listing of impairments found in Appendix 1 of Subpart B of Part 404 of the federal regulations. 20 CFR §§ 404.1520(A)(4)(iii), 416.920(a)(4)(iii) The claimant will be determined to be automatically disabled without consideration of his or her age, education or work experience if the claimant's impairments are sufficiently severe to meet or equal the criteria of any impairment listed in the Appendix. *See*, *Lankford v. Sullivan*, 942 F.2d 301, 306 (6th Cir. 1991); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

When the severity of the claimant's impairments does not meet or equal the listings, then the Commissioner must determine at step 4 whether the claimant retains the residual functional capacity (RFC) given his or her impairments to permit a return to any of his or her past relevant

work.  20 CFR §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  *See, Smith v. Secretary*, 893 F.2d 106,

109-110 (6th Cir. 1989).  A claimant who retains the residual functional capacity, despite his or

her severe impairments, to perform past relevant work is not disabled. 20 CFR §§

404.1560(b)(3), 416.960(b)(3)  The burden switches to the Commissioner at step 5 of the

sequential evaluation process to establish that the claimant, who cannot return to his or her past

relevant work, remains capable of performing alternative work in the national economy given his

or her residual functional capacity, age, education and past relevant work experience.  See, 20

CFR §§ 404.1520(a)(4)(v), 404.1560( c ), 416.920(a)(4)(v), 416.960( c ); *Felisky v. Bowen*, 35

F.3d 1027, 1035 (6th Cir. 1994); *Herr v. Commissioner*, 203 F.3d 388, 391 (6th Cir. 1999).

Collectively, the above disability evaluation analysis is commonly referred to as the "5-step

sequential evaluation process."


**Standard of Review.**

Review of a decision of the Commissioner is governed by 42 U.S.C. § 405(g).  The

statute, and case law that interprets it, require a reviewing court to affirm the findings of the

Commissioner if they are supported by substantial evidence and the Commissioner has employed

the appropriate legal standard.  *Walters v. Commissioner of Social Security*, 127 F.3d 525, 528

(6th Cir. 1997) ("This Court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.).  Substantial evidence is defined by the

Supreme Court to be "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971).  *See also, Lashley v.

Sec'y of HHS*, 708 F.2d 1048, 1053 (6th Cir. 1983) (citing *Perales*).  It is more than a mere

scintilla of evidence or evidence that merely creates the suspicion of the existence of a fact, but must be enough evidence to justify a refusal to direct a verdict if the matter were tried to a jury. *Sias v. Sec'y of HHS*, 861 F.2d 475, 479 n. 1 (6th Cir. 1988).

The substantiality of the evidence is to be determined based upon a review of the record taken as a whole, not simply some evidence, but rather the entirety of the record to include those portions that detract from its weight. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Laskowski v. Apfel*, 100 F. Supp.2d 474, 482 (E.D. Mich. 2000). So long as the decision of the Commissioner is supported by substantial evidence, it must be upheld by the federal court even if the record might support a contrary conclusion. *Smith v. Sec'y of HHS*, 893 F.2d 106, 108 (6th Cir. 1989). The substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).

**Issues for Review.**

*Findings of Fact 5, 6 and 7.*

Johnson in her fact and law summary challenges the factual and legal adequacy of findings 5, 6 and 7 Judge Mather's hearing decision. Specifically, she first claims that the ALJ's assessment of her credibility is "fatally flawed." Johnson provides two examples of the alleged credibility errors by ALJ Mather. First, she maintains that he improperly discounted her credibility based on the discontinuation of her physical therapy, when the ALJ was fully aware that Johnson was forced to cease physical therapy when her limited funds would no longer permit her to pay for it. She now claims that this reliance upon her discontinued physical therapy to discredit her testimony concerning her complaints of disabling pain violated Social Security

Ruling (SSR) 96-7p which prohibits the Commissioner from considering the inability to afford medical care as a basis to draw any inferences about a claimant's symptoms or their functional effects.

Second, Johnson in her fact and law summary challenges ALJ Mather's interpretation of the physical functional capacity examination results obtained by Occupational Kinetics LLC (Tr. 375-598). Johnson in particular disputes the finding of ALJ Mather that she exhibited inconsistencies in 20 out of 24 activities tested (Tr. 38). To the contrary, Johnson maintains that a fair reading of the report by Occupational Kinetics reveals that she actually performed "within expected limits" in 20 of 24 measures (Tr. 376). Accordingly, Johnson concludes that not only did the ALJ rely on prohibited evidence - - her financial inability to continue physical therapy - - he also grossly misinterpreted valid evidence of her limited functional capacities obtained by Occupational Kinetics.

In her second argument, Johnson claims that ALJ Mather failed to properly address her complaints of disabling pain in violation of SSR 96-7p. She focuses initially on his alleged failure to include in his assessment any reference to her hand and arm pain and accompanying numbness, which Johnson clearly testified to during her hearing testimony (Tr. 73). This ongoing pain and numbness in her arms and hand, according to her, also is reflected throughout the medical records (Tr. 401, 468, 472, 537). Accordingly, Johnson concludes that the ALJ's RFC finding is both incomplete and inaccurate.

She also claims in her second argument that ALJ Mather erroneously interpreted the medical reports of her treating neurosurgeon, Dr. Nazar. Dr. Nazar's opinions, according to Johnson, are not inconsistent with her complaints of disabling pain. Rather, the doctor limited her to lifting no more than 10 lbs, which in Johnson's view is entirely indicative of her serious

spinal problems and resulting continuous, severe pain.  Yet, ALJ Mather inappropriately

dismissed Dr. Nazar's restrictions, focusing instead on a few isolated, relatively benign findings.

Johnson therefore concludes that the hearing decision by ALJ Mather is not supported by

substantial evidence as to findings of fact 5, 6 and 7, and should be remanded for an award of

benefits, or alternatively for further proceedings.


*Credibility.*

The primary thrust of Johnson's fact and law summary runs to the credibility

determination of ALJ Mather concerning her complaints of disabling pain (DN 9, FLS at p. 5-8).

At the time of the hearing held on June 10, 2011, Johnson was 40 years old, married with two

teenage children and a prior work history as a warehouse laborer and bank check processor (Tr.

43, 152, 165-73, 181-85).  Johnson testified at the hearing that she is "always in pain" and is

"never really comfortable."  (Tr. 62).  As she explained it, Johnson experiences pain in her neck

and down her right side that travels through her lower back, right hip and right leg to her foot

(Tr. 63).  Her feet and both of her hands also hurt (Tr. 63, 64).

Johnson estimated that her neck pain averages between 5 and 7 on a 10-point pain scale

(Tr. 65).  This occurs several times a day.  She also has trouble holding objects in her hands due

to numbness that causes her to drop things (Tr. 65-66).  Problems with her shoulders prevent

Johnson from lifting items over her head as well (Tr. 66).  As she explained matters, her low

back hurts constantly with a severity of 7-10 on the pain scale (Tr. 67).  She does take pain

medication and uses heat for her back pain, but her medication merely eases the pain without

removing it (Tr. 68).

Both her lower back and her right leg hurt constantly (Tr. 68).  Although Johnson does use a cane to ambulate, and did so at the hearing before ALJ Mather, she has never been prescribed one (Tr. 69).  Her pain doctor, Dr. Reasor, has given her epidural shots, as well as an injection in her SI joint, but the shots did not work according to Johnson (Tr. 70).

Johnson does not believe that she could perform sedentary work due to the pain her neck and her hand problems (Tr. 71).  Sitting all day long, according to her, would aggravate her back condition.  Johnson estimated that she can sit for only 8-10 minutes before she must change position (Tr. 71).  As an example, she related that after driving her car only ten minutes, her leg is completely numb and she requires a back cushion in her car when she drives (Tr. 72).  According to her, her back pain will wake her two or three times each evening when she tries to sleep (Tr. 73).

Due to her hand problems, Johnson explained that she cannot peel potatoes or completely fill out a check as her hands will start to ache (Tr. 73).  She can only stand for 5-10 minutes due to her back pain, and cold weather increases it (Tr. 74).  When asked why she did not believe that she could perform a sedentary, sit-down type of job, as her treating neurosurgeon, Dr. Lazar, had suggested, Johnson explained that even sitting for only an hour, such as during the administrative hearing, had put her "in a lot of pain … just sitting here." (Tr. 77).  VE Piper testified on examination by ALJ Mather that if Johnson's testimony about her limitations on  walking, standing and sitting were assumed to be credible, then there would be no competitive employment that she would be able to perform based on her need to make frequent changes in position (Tr. 80).

With this hearing testimony in mind, the Court turns to the question of credibility.  An administrative law judge properly may consider the credibility of a claimant when evaluating the

claimant's subjective complaints, and the federal courts will accord "great deference to that credibility determination." *Warner v. Comm'r*, 375 F.3d 387, 392 (6th Cir. 2004).

The standard in the Sixth Circuit for evaluating subjective complaints, such as complaints of pain for example, was established in *Duncan v. Sec'y of H&HS*, 801 F.2d 847, 853 (6th Cir. 1986). *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (setting forth the *Duncan* standard).

Under *Duncan*, the Court first determines whether objective medical evidence of an underlying medical condition is present in the record. *Id*. If so, then the Court will examine whether such evidence confirms the severity of the claimant's subjective symptoms related to the condition, or whether the objectively established medical condition itself is of sufficient severity that it can be reasonably expected to produce the alleged subjective symptoms, such as disabling pain. *Id*. The findings of the ALJ in this regard are repeatedly held in the Sixth Circuit to be accorded great weight and deference given the ability of the ALJ to observe the demeanor and credibility of the witnesses. *Walters v. Comm'r*, 127 F.2d 525, 531 (6th Cir. 1997) (citing *Villarreal v. Sec'y*, 818 F.2d 461, 463 (6th Cir. 1987)). Yet, the ALJ is not accorded absolute deference and his or her assessment of a claimant's credibility must be supported by substantial evidence. *Beavers v. Sec'y*, 577 F.2d 383, 386-87 (6th Cir. 1978).

When the ALJ "finds contradictions among the medical reports, claimant's testimony and other evidence," the ALJ may properly discount the credibility of the claimant. *Winning v. Comm'r*, 661 F. Supp.2d 807, 822 (N.D. Ohio 2009) (citing *Walters*, 127 F.3d 525, 531 (6th Cir. 1997)). The ALJ, however, is not permitted to render a credibility determination based solely upon a hunch, or "intangible or intuitive notion about an individual's credibility." *Id*. (citing *Rogers*, 486 F.3d at 247) (citing SSR 96-7p)). Under SSR 96-7p, the ALJ must in the hearing

decision set forth specific reasons for the credibility determination sufficient to make clear to the claimant and subsequent reviewers the weight that the ALJ gave to the claimant's statements and the reasons for such weight. *Winning*, 661 F. Supp.2d at 823. A mere blanket assertion that a claimant is not believable will not be sufficient under SSR 96-7p. *Id*. (citing *Rogers*, 486 F.3d at 248).

An assessment of the claimant's credibility must be based on a consideration of all the evidence of record. It should include consideration of not only the objective medical evidence but the following factors as well: (1) the daily activities of the claimant; (2) the location, duration, frequency, and intensity of the claimant's symptoms including pain; (3) any factors that precipitate or aggravate the symptoms; (4) the dosage, type, effectiveness and side effects of any medication taken to alleviate such symptoms or pain; (5) treatment that the claimant has received for relief of his or her symptoms; (6) any measures other than treatment that the claimant uses to relieve his or her symptoms; and (7) any other factors relating to the functional limitations and restrictions of the claimant due to such symptoms or pain. *Id*. at 823 n. 14 (citing SSR 96-7p). Also included among the evidence that the ALJ must consider are the medical signs and laboratory findings of record, the diagnosis, prognosis and medical opinions provided by any treating physicians or other medical sources, and any statements or reports from the claimant, physicians or other persons about the claimant's medical history, treatment, response to treatment, prior work record, daily activities and other information related to the symptoms of the claimant and how such symptoms affect his or her ability to work. *Id*.

When the record establishes consistency between the subjective complaints of the claimant and the other evidence of record, such consistency will tend to support the credibility of claimant, while in contrast, any inconsistency in this regard will tend to have the opposite effect.

*Winning*, 661 F. Supp.2d at 823.  The reviewing court does not make its own credibility determinations.  *Franson v. Comm'r*, 556 F. Supp.2d 716, 726-27 (W.D. Mich. 2008) (citing *Walters*, 127 F.3d at 528)).  The federal courts will not substitute their own credibility determination for that of the ALJ as the fundamental task of the Commissioner is to "resolve conflicts in the evidence and to decide questions of credibility."  *Rineholt v. Astrue*, 617 F. Supp.2d 733, 742 (E.D. Tenn. 2009) (citing *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).  Given the substantial deference accorded the credibility determination of the Commissioner, "'claimants challenging the ALJ's credibility determination face an uphill battle.'"  *Franson*, 556 F. Supp.2d at 726-27 (citing *Daniels v. Comm'r*, 152 Fed. Appx. 485, 488 (6th Cir. 2005)).

The first question in light of the above law is whether ALJ Mather erred when he noted among other factors at p. 7 of his hearing decision that Johnson had not been entirely compliant with her treatment for her back-related symptoms (Tr. 41).  As one example, among many of the facts that he considered in assessing her credibility, ALJ Mather noted that "though it was recommended that the claimant follow in physical therapy by her physician (Exh. 4F), it does not appear that she has consistently done so (Exhs. 1F, 8F)."  (Id.).  Johnson insists that she ceased physical therapy in December of 2008, solely due to the refusal of her insurance company to continue making payment for it - - a fact known to ALJ Mather, which he earlier related at p. 3 of his hearing decision (Tr. 37).  Consequently, she maintains that her financial inability to continue physical therapy should not have been relied on by ALJ Mather and was contrary to SSR 96-7p (DN 9, pp. 5-6).

Johnson is correct insofar as her understanding that an ALJ is not permitted to draw an adverse inference about a claimant's symptoms based solely on the failure to seek or pursue

regular medical treatment, without giving consideration to the claimant's explanation that he or she is "unable to afford treatment." *See Holt v. Colvin*, Case No. 3:12-00445, 2013 WL 4040056 at \*16 (M.D. Tenn. Aug. 8, 2013) (citing SSR 96-7p, 1996 WL 374186); *Tollison v. Colvin*, Case No. 2:12-CV-00004, 2013 WL 3367101 at \*10 (M.D. Tenn. July 5, 2013) (same).

Here, the Court concludes that ALJ Mather did not improperly rest his credibility decision on the failure of Johnson to continue physical therapy in December of 2008, due to a lack of insurance. Judge Mather undoubtedly does mention in his decision at p. 3, her lack of insurance as a basis for the discontinuation of physical therapy. He then immediately continues, however, to note the existence of an updated physical therapy evaluation in April of 2010, at Kort (Tr. 330-352). After the ALJ notes that Johnson denied any difficulty sleeping or driving at that time in 2010, he continues in his decision to add that there is no evidence that Johnson followed up with further treatment as suggested. Moreover, ALJ Mather's mention of the discontinued physical therapy in December of 2008, is but a small portion of his detailed and thorough consideration of all of the factors of SSR 96-7p.

ALJ Mather, for example, correctly noted that Johnson's treating neurosurgeon, Dr. Gregory Nazar, on his initial examination of Johnson in September of 2008, presented with a normal neurological examination despite relating a history of radiating low back pain (Tr. 269-270). Dr. Nazar's examination report found "no signs or symptoms to indicate acute radiculapathy or myelopathy as being present." (Id.). Johnson presented with negative straight leg raising and negative femoral stretch testing. (Id.). She walked with a normal gait and her back movements were reported by the doctor to be only "mildly restricted." (Id.). An MRI study performed earlier that month revealed only "mild scoliosis," which Dr. Nazar concluded

had probably been present since Johnson's adolescence (Id.). The doctor found only some "mild degenerative changes but no definitive area of nerve root compression displacement…." (Id.).

Likewise, his review of the MRI study showed only "slight narrowing of the neuroforamina L4-5." (Id.). Dr. Nazar did not feel that there was any compression of the right L4 or L5 nerve roots. Based on all of these objective findings, Dr. Nazar favored conservative treatment that included physical therapy combined with Medrol dosepak, Relafen and postural and positional modifications (Id.).

The following month when Johnson returned to Dr. Nazar, he noted in his examination report that "there does not appear to be a need for surgical intervention…." (Tr. 267). His plan was to reestablish her physical therapy and "to have her return back to work but with restrictions." (Tr. 267). He scheduled Johnson's return to work date at that time as being November 10, 2008, and restricted her to no lifting or carrying greater than 25 lbs., along with being able to change position frequently and avoid repetitive twisting of her back (Tr. 267). Dr. Nazar was unclear at that time whether these restrictions would be permanent (Id.).

ALJ Mather in his hearing decision at p. 4, again correctly noted that by December of 2008, Dr. Nazar reported Johnson to be "clinically doing well," and that she had noted "a substantial improvement in her pain having responded nicely to physical therapy…." (Tr. 266). Based on her improvement, Dr. Nazar planned "to have her return back to work without restrictions." (Id.). He noted at the time that her "neurological examination remains within normal limits" and that "there are no current signs or symptoms to suggest radiculopathy or myelopathy." Her straight leg raising, femoral stretch testing and gait remained normal without restriction. (Id.).

By June of 2009, Dr. Nazar again reported that Johnson exhibited "no current signs or symptoms of radiculopathy in either the upper or lower extremities," although he did note a decreased range of motion. (Tr. 265). Dr. Nazar reviewed a recent bone scan study performed on May 14, 2009, that did reveal some increased uptake in the L4-5 facet joints of her lumbar spine (Id.). Otherwise, plain x-rays of Johnson's cervical spine were normal. Given that her then-current job at UPS involved lifting, bending, stooping and twisting her back, and that Dr. Nazar believed that this "type of work will aggravate her symptoms," he signed a work release. Otherwise, the doctor merely refilled her pain medication, Darvocet, and gave her a prescription for Medros dosepak (Tr. 265).

When Johnson returned to Dr. Nazar for a final visit on June 30, 2009, the doctor again noted that her neurological examination results remained within normal limits (Tr. 263). Johnson exhibited "no current signs or symptoms that would be indicative of radiculopathy or myelopathy…." At most, the doctor noted a restricted range of motion in her back and neck associated with discomfort. Based on his examination, Dr. Nazar wrote in his report:

> I would concur with Mrs. Johnson that it would be beneficial to her
> to avoid strenuous activity such as lifting or carrying greater than
> 10 lbs. and performing any type of repetitive bending, lifting, or
> stooping position. I, therefore, feel that she should switch jobs to a
> sitting position, this would be reasonable to accommodate. She
> unfortunately is unable to do her present job at work due to her
> physical limitations and the pain she is describing.

(Tr. 263). Dr. Nazar indicated that he would plan to follow Johnson electively as "there does not appear to be a need or role for aggressive treatment interventions (i.e. surgery) (Id.).

Review of the medical record further confirms that substantial evidence, apart from the discontinuation of physical therapy on one occasion, fully supports the credibility determination of ALJ Mather. For example, on three occasions, once each month in March, April and May of

2009, Johnson appeared at Norton Healthcare with complaints of low back pain (Tr. 258-262). On each occasion, examination confirmed negative straight leg raising and normal reflexes (Tr. 258, 260, 261).

Dr. Larry Zhou, a pain management specialist, examined Johnson in October of 2009, for her complaints of low back, right hip and right leg pain (Tr. 271-273). On that occasion, Dr. Zhou noted that she appeared to have lumbar degenerative disk disease along with lumbosacral spondylosis/facet hypertrophy (Tr. 272). While Johnson's strength remained grossly intact in both her upper and lower extremities, and she was able to ambulate without assistance, Dr. Zhou did note moderate tenderness in her lumbosacral spine upon palpitation which was exacerbated by flexion and hyperextension (Id.). Her straight leg raising test on that occasion was noted to be positive on the right side. Although Dr. Zhou recommended lumbar epidural steroid injections and lumbar facet treatment, Johnson declined the immediate treatment recommended by Dr. Zhou, and instead requested strong pain medication. Dr. Zhou advised against as this course of treatment as "taking high-dose narcotics is not her best choice, given the options we can use to decrease her back pain." (Tr. 272). Johnson requested additional time to think about Dr. Zhou's recommended treatments before proceeding (Id.).

Johnson did return to Dr. Zhou at the Pain Institute in late 2009 for treatment (Tr. 303). She thereafter began to receive a series of epidural nerve blocks at the right L4-5, L5-S1 (Tr. 291, 295, 300). On each occasion, Dr. Zhou's treatment report indicates that Johnson was able to ambulate and to bear weight without difficulty following the injection procedure (Tr. 294, 298, 302, 307).

Subsequently, Johnson was examined by Dr. Gary Reasor at Metro Pain Associates in September of 2010, after concluding her treatment with Dr. Zhou (Tr. 366-67). On the first

occasion, she complained of low back pain, neck pain and occasional numbness and tingling in her hands (Tr. 366). Physical examination revealed normal gait and station with symmetric deep tendon reflexes in the upper and lower extremities, as well as normal 5/5 motor strength and sensory exam (Tr. 367). Her straight leg raising test on that occasion was negative bilaterally. Musculoskeletal examination revealed tenderness to palpation over the cervical spine at the C4-C6 with mild tenderness at the bilateral sacroiliac joints.

Imaging studies of the cervical spine, however, were "essentially negative, unremarkable…." An MRI of her lumbar spine dated Sept. 9, 2008, revealed only mild scoliosis, mild degenerative disk disease and facet arthropathy in the lower lumbar spine with moderate inferior foraminal narrowing at the right L4-5 with mild inferior narrowing at the left and on the right at the L5-S1. Dr. Reasor recommended cervical facet diagnostic blocks and a right sacroiliac joint injection, along with Percocet for pain medication (Tr. 367).

When Johnson returned to Metro Pain Associates in January of 2011, she related that her prescription of Xanaflex had been helpful at bedtime and that she was tolerating her Duragesic patch without any adverse side effects (Tr. 372). Otherwise, her deep tendon reflex examination remained symmetric in both the upper and lower extremities and her straight leg raising test again was negative bilaterally (Id.). Musculoskeletal examination revealed tenderness and spasm in the lumbar paraspinalis along with tenderness of the neck at the right splenius capilis (Id.). Accordingly, repeated imaging from Johnson's neck and spine, along with diagnostic examination on various occasions, failed to reveal any substantial abnormalities that would support the type of severe, persistent, untreatable pain that Johnson complained of during the administrative hearing. ALJ Mather properly took this medical history into consideration.

ALJ Mather also properly noted in determining Johnson's credibility the level of her daily activities as well. Johnson acknowledged in her hearing testimony that she continues to drive her car several days a week. She is able, with assistance, to cook, wash dishes, grocery shop, do the laundry and vacuum occasionally (Tr. 58-59, 60-61,72, 74). She is able to play bingo and to watch tv, as well (Tr. 59) ALJ Mather correctly pointed out in the credibility portion of his hearing decision at p. 6-7, that this activity level is contrary to her complaints of persistent disabling pain (Tr. 40-41). The ALJ therefore did not base his credibility decision in any significant respect, much less solely, on Johnson's discontinued physical therapy in December of 2008. Rather, he comprehensively reviewed the medical records in detail, along with Johnson's hearing testimony, to properly reject her credibility.

The Court disagrees with Johnson that ALJ Mather in assessing her credibility misconstrued the fundamental findings of the functional capacity examination report prepared by Occupational Kinetics, LLC. (Tr 376-98) To the contrary, the Occupational Kinetics report appears to strongly reinforce the credibility determination of ALJ Mather (Tr. 375-398). In the conclusion section of the report on p. 4 of the 24-page report, the evaluators, Mike Rowls, MS, CPT, CFB; Troy Davis, DC; and Dr. Eric DeYoung, a neuropathic doctor, wrote the following summary:

> Overall, Ms. Johnson demonstrated a self-limited effort in this evaluation, with inconsistencies in 20 of the 24 activities including bilateral grip strength, straight leg raise, and bi-manual fingering. She also showed some signs of self-limiting behavior including guarded and deliberate movements and a positive Libman's orthopedic test[1] which can demonstrate malingering behavior.

---

[1] Libman's test is "a test used in the evaluation of the pain threshold in the individual patient. It involves pressure on both the tip of the mastoid bone and the styloid process and then grading the patient's response to determine sensitivity to painful stimuli. Stanley Hoppenfelk & Michael Zeide, *Orthopedic Dictionary*, p. 207 (Lippincott Co. 1994). See also, Trigger Point Definitions available at http://communityhealthtraining.org/TPDefinitions.htm (last accessed on Aug. 14, 2013).

(Tr. 378). Johnson now dismisses this critical portion of the report based on a separate portion that refers to the reliability and consistency of her efforts during examination (Tr. 376). In this preceding section of the report, the same examiners make the following statement:

> The results of this evaluation suggest that Ms. Johnson gave a self-limited effort with 20 of 24 consistency measures within expected limits. The following inconsistencies are noted: coefficient of variance (CV) – 15% allowance for Standard-left (23.2%) Standard-right (22.2%); MTM CV 10% allowance for bi-manual fingering (13.3).

(Tr. 376).

When the two quoted passages are logically read together, it is clear that the evaluators considered Johnson's physical efforts to be self-limited and inconsistent in 20 of the 24 physical activities that she performed, including her bilateral grip strength, straight leg raise and bimanual fingering (Tr. 378). The Court does not read any contradiction in these conclusions based on the earlier passage that Johnson "gave a self-limited effort with 20 of 24 consistency measures within expected limits." (Tr. 376). As the Court reads this passage, Johnson failed to perform to the expected limits. In other words, the term "within" is interpreted by the Court to mean less than expected. Nevertheless, despite her self-limited efforts and possible malingering as demonstrated by the positive Libman's orthopedic test, Johnson was determined functionally to be able to perform sedentary work by the evaluators (Tr. 377).

The Occupational Kinetics report indicates that she retained the ability to perform lifting activities within the sedentary category and demonstrated the ability to perform on a constant basis bimanual handling and bimanual fingering, although she was noted to have decreased bilateral grip strength and a decreased range of motion in her cervical and lumbar spine (Id.). Accordingly, we do not conclude that ALJ Mather misinterpreted otherwise valid evidence

contained in this report, which the Court again emphasizes is strongly supportive of ALJ Mather's credibility determination.

In the second argument section of her fact and law summary, Johnson continues to argue that ALJ Mather's decision is fatally flawed because he failed to take into consideration her testimony and the medical records relating to her complaints of arm and hand pain and numbness when he determined her residual functional capacity in finding of fact no. 5 (Tr. 39-42). Johnson claims in this respect that the ALJ ignored the provisions of SSR 96-7.p, which provides that a claimant's allegations concerning the intensity and persistence of her pain or other symptoms may not be disregarded solely because they are not substantiated by objective medical evidence.

The Court has carefully examined ALJ Mather's hearing decision (Tr. 35-42). In his decision, ALJ Mather directly relates Johnson's testimony concerning her arm and hand difficulties at p.6 of his report (Tr. 40). He correctly summarizes Johnson's testimony concerning her difficulty gripping with her hands, which she complained are numb and ache (Id.). ALJ Mather obviously disregarded her credibility in this regard, however. His credibility decision in this respect again is fully supported by the medical records.

While examination by Occupational Kinetics did reveal mildly diminished sensation to light touch in both hands (Tr. 377-78), Johnson was noted during the examination to perform on a consistent basis bimanual handling and bimanual fingering (Tr. 377). Further, the Occupational Kinetics report, in the section on activities rated by frequency and duration, reflects the same conclusion-- that she retains the ability to perform constant handling and fingering of objects (Tr. 380). This conclusion is reflected on the Methods-Time Measurement (MTM) functional abilities summary portion of the report, which reflects that Johnson's ability to perform bimanual handling and fingering fully meets the industry standard, "which is the time an

average worker with average training could perform the listed activity assuming the activity is performed over an average 8-hour day."  (Tr. 384).

The examination report of board certified neurologist, Dr. Michael Alt, also supports ALJ Mather's credibility determination as it relates to Johnson's complaints of arm and hand pain and numbness.  Dr. Alt examined Johnson on Sept. 12, 2011 (DN 237-238).  In his examination report, Dr. Alt opines that he does "not feel that she is disabled neurologically as everything seems to be intact."  Although he did note some "give way weakness of the wrist, the doctor otherwise found that  Johnson had normal sensation to temperature, vibration and touch, normal muscle tone, bulk and power throughout manual testing (Tr. 437).  Further, as to Johnson's complaints of chronic pain, Dr. Alt's assessment was that "Dr. Reasor is controlling [her pain] well."  Accordingly, Dr. Alt concluded that an exercise routine along with an antidepressant might improve Johnson's overall level of functioning.  Although Dr. Alt scheduled a follow-up EMG of Johnson's upper and lower extremities, his anticipatory opinion was that "this will be unremarkable."  (Tr. 483).

 The Court, in light of the findings of Dr. Alt, and those of Occupational Kinetics, does not find that ALJ Mather's determination concerning Johnson's RFC, as it relates to her arms and hands, is incomplete or otherwise inaccurate.  ALJ Mather simply chose to reject Johnson's testimony regarding this aspect of her functional limitations.  The record fully supports his credibility determination in this regard.

The final section of Johnson's fact and law summary directly challenges ALJ Mather's review of Dr. Nazar's medical treatment records.  Those records have previously been summarized in this report and recommendation.  Johnson's main point of her challenge is that ALJ Mather selectively cited the benign nature of certain findings made by Dr. Nazar, which the

doctor characterized as being "normal," "mild," "slight," "otherwise normal," "within normal limits" and "minimal," while ignoring the functional limitations that Dr. Nazar placed upon her. Specifically, Johnson focuses on Dr. Nazar's treatment report which limits her to lifting nor more than 10 lbs and to avoiding repetitive bending, lifting or stooping positions (Tr. 263). Johnson now contends that these restrictions on a younger individual such as herself are supportive of her claims of "more serious problems" and that ALJ Mather's reliance upon such restrictions implies his acceptance of the existence of her serious pain (Tr. DN 9, FLS at p. 7).

The Court once again must disagree. ALJ Mather in his hearing decision at p. 6 concludes that Johnson's medically determinable impairments could reasonably be expected to cause some of her symptoms, but her statements concerning the intensity, persistence and limiting effects of those symptoms are not credible. (Tr 40). In reaching this conclusion, ALJ Mather, as the Court has noted, made a thorough and accurate summary of the medical record. His adoption of the functional restrictions by Dr. Nazar, whom the Court notes recommended that Johnson "switch jobs to a sitting position," does not indicate that ALJ Mather improperly assessed Johnson's credibility. Thus, even Dr. Nazar, Johnson's treating neurosurgeon, expressed the belief in his examination reports that Johnson is fully capable of returning to sedentary employment with the very same restrictions that ALJ Mather relied upon in determining Johnson's residual functional capacity in finding of fact no. 5. (Tr. 39-42).

Accordingly, Johnson has failed to carry her burden to show that ALJ Mather's well-reasoned hearing decision is unsupported by substantial evidence or otherwise incorrect in its application of the law. Because the decision of ALJ Mather is supported by substantial evidence of record, and because vocational expert Piper testified, based upon a hypothetical proposed by the ALJ that accurately reflects Johnson's RFC, that she remains capable of returning to her past

relevant work as a check processor, as such work is performed in the national economy, the

decision of the Commission should be affirmed.


## RECOMMENDATION

The Magistrate Judge having made findings of fact and conclusions of law recommends

that the decision of the Commissioner be **AFFIRMED**.


## <u>NOTICE</u>

Within fourteen (14) days after being served a copy of these proposed Findings and Recommendation, any party who wishes to object must file and serve written objections or further appeal is waived. *Thomas v. Arn*, 728 F.2d 813 (6th Cir. 1984), *aff'd.*, 474 U.S. 140 (1985). 28 U.S.C. § 636(b)(1)(c); Fed.R.Civ.P. 72(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b)(2).

Copies to Counsel of Record